UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

VICTORIA JENSEN,

        Plaintiff,

       v.                           Case No. 06-C-0350

AIRTRAN AIRWAYS,

        Defendant.

DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT (DOC. # 19) AND DISMISSING CASE

        Plaintiff, Victoria Jensen, was employed by defendant AirTran Airways between July 19, 2002, and October 6, 2003.  She alleges that during her employment she was subjected to discrimination based on her sex and her pregnancy, unlawful retaliation, and interference with her rights under the Family and Medical Leave Act (FMLA).  (*See* Compl. ¶¶ 29-37.)  She brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and the FMLA, 29 U.S.C. § 2601 et seq.  Before the court is AirTran's motion for summary judgment on all claims.

SUMMARY JUDGMENT STANDARD

        Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party has the initial burden of demonstrating that it is entitled to summary judgment.  *Id.* at 323.  Once this burden is met, the nonmoving party must designate specific facts to support or defend its case.  *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

BACKGROUND[1]

---

[1] Five related cases, including this one, were brought by former AirTran employees against AirTran—*Dalton v. Airtran Airways*, Case No. 06-CV-348 (E.D. Wis); *Jensen v. AirTran Airways*, Case No. 06-CV-350 (E.D. Wis.); *Henneman v. AirTran Airways*, Case No. 06-CV-368 (E.D. Wis.); *Ott v. AirTran Airways*, Case No. 06-CV-371 (E.D. Wis.); *Cain v. AirTran Airways*, Case No. 06-CV-489 (E.D. Wis.). While these cases have not been consolidated, the defendants moved for summary judgment in all cases, and the parties consolidated briefing for all summary judgment motions. This resulted in nearly 1300 proposed findings of fact submitted by the parties (293 for the defendants, 1096 by the plaintiffs), along with several thousand pages of response materials and supporting documents. And, while the parties have submitted a very limited set of stipulated facts, most of their proposed findings of fact are disputed. Navigation of the record has therefore been a substantial and time-consuming endeavor.

With that in mind, the court has relied on the parties' set of stipulated facts, as well as each side's proposed findings of fact to the extent that they are undisputed, or that any alleged dispute is immaterial, unsupported, or otherwise not compliant with the local rules. Stipulated proposed findings of fact are designated as "SPFOF"; Defendant's proposed findings of fact are identified as "DPFOF"; and plaintiff's proposed findings of fact are identified as "PPFOF."

2

AirTran is a low-fare commercial airline that has operated out of Milwaukee since June 2002. It has corporate offices in Orlando, Florida and Atlanta, Georgia. The Milwaukee station operates with about twenty-five employees. This includes a station manager, which is the top spot, followed by two or three station supervisors. All other employees carry the title of customer service agent.

Victoria Jensen was a customer service agent for AirTran in Milwaukee between July 19, 2002 and October 6, 2003. Jensen's fellow customer service agents included James Lipsey, who worked for AirTran from July 2002 to April 28, 2005; Larry Moore, who worked for AirTran from July 2002 to August 28, 2003; and Wes Davis, who worked for AirTran starting in February 2003. In addition, Laurie Dalton, Susan Henneman, Tami Ott, and Latrina Cain (who are all plaintiffs in related actions against AirTran) were employed by AirTran in Milwaukee as customer service agents. Dalton, who is Jensen's mother, worked for AirTran between July 19, 2003, and October 6, 2003; Henneman between May 31, 2002, and January 26, 2004; Ott between May 31, 2002, and August 9, 2005; and Cain between July 31, 2003, and November 4, 2003.

Terese Sellers was the station manager for AirTran between March 6, 1999 and February 4, 2005. David Fox, who served as a station supervisor between July 2002, and January 2006, became the station manager in January 2006. Tom Cross was a station supervisor for AirTran from May 31, 2002 to October 13, 2006.

Decisions regarding hiring, promotions, transfers, layoffs, recalls, discipline, scheduling, and discharge of customer service agents are made by the Milwaukee station manager or a human resources officer at AirTran's corporate headquarters. Station supervisors may assign personnel to various tasks and may issue Employee Discipline

3

Reports and Attendance Review Forms (reflecting absences or tardiness). For the most part, station supervisors perform their tasks alongside customer service agents.

Customer service agents perform various duties, including issuing tickets and boarding passes; checking baggage; assisting passengers boarding and exiting aircraft; loading and unloading bags at the ticket counter, gate, and aircraft; cleaning aircraft; security; marshaling aircraft; and otherwise providing service to customers. (DPFOF ¶ 12.[2]) These duties are performed at three principle areas: the passenger ticket counter; the flight gate; and the flight tarmac (also referred to as "ramp" duties). (DPFOF ¶ 23.) All customer service agents are trained to work in these three areas because staffing levels necessitate that each employee be prepared to work in any area during a given week, and to move from one area to another during a given day. (DPFOF ¶ 25.[3])

Some of the tasks associated with the customer service position involve heavy lifting and general physical labor. The job description for a customer service agent includes, among other things, the ability to work indoors and outdoors with strength and stamina to endure standing for an entire shift, as well as the ability to lift and move items up to seventy pounds repetitively, as well as the ability to climb, bend, kneel, crawl, and

---

[2] Of note, many of the plaintiff's responses to the defendant's proposed findings of fact do not comply with Civil Local Rule 56.2(b)(1) (in effect prior to February 1, 2010). That Rule provides that materials in opposition to a summary judgment motion must include "A specific response to the movant's proposed findings of fact, clearly delineating only those findings to which it is asserted that a genuine issue of material fact exists. The response must refer to the contested finding by paragraph number and must include specific citations to evidentiary materials in the record which support the claim that a dispute exists." Often, the court is left to wonder what aspects of a proposed finding of fact are actually disputed, why they are disputed, and what evidence specifically calls the proposed fact into dispute. Without proper objections, such proposed findings may be deemed admitted for purposes of the summary judgment motion.

[3] The plaintiff "denies" this proposed fact, but (1) she does submit a proper objection pursuant to Civil L.R. 56.2(b)(1), and (2) the proposed findings of fact that she cites in support of her "denial" (or the evidence supporting the proposed facts) do not speak to this point. (*See* Pl.'s Resp. to DPFOF ¶ 25.)

4

stoop frequently. (Fox Decl. ¶¶ 24-26, Def.'s Ex. 8.) This is particularly true on the ramp, though agents working at the counter or the gate often have to move or assist with luggage. (DPFOF ¶ 29.) Agents wear different uniforms depending on whether they are working the ramp or the ticket counter, and may be required to change clothes to assist in another area during a shift. (*See id.* ¶ 27.)

In addition, at certain times, AirTran assigned personnel to the "operations center," where agents perform administrative tasks related to incoming and outgoing flights. AirTran also assigned personnel to "baggage services," where agents work in the baggage claim area and in AirTran's lost baggage office. (SPFOF ¶¶ 32-35.) Further, agents were assigned regularly to an area known as the "bag room," which is part of the "ramp" assignment. In the bag room, agents load bags from the ticket counter conveyor belt onto carts for transport to the tarmac, and load and unload bags relative to aircraft and the baggage claim carousel. (DPFOF ¶ 31.) As opposed to the tarmac, the bag room is protected from the elements, heated in the winter and cooled in the summer. Agents in the bag room routinely interact with agents on the ramp and the ticket counter. (*Id.* ¶¶ 31-32.)

Occasionally, certain agents were assigned only to the ticket counter or gate (as opposed to the ramp) for short periods while recovering from injury. (DPFOF ¶¶ 46-48; PPFOF ¶¶ 63, 73.) Agents understood this to be "light duty," though AirTran had no official "light duty" assignment. (*See* PPFOF ¶ 57; DPFOF ¶ 44.) Instead, AirTran's policy was to work with agents to assess whether modified duty may be available to an agent recovering from an on-the-job injury, though such modified duty is not guaranteed and varies from case to case. (DPFOF ¶ 11.) In early 2003, AirTran station managers were informed that extensive modified duty assignments were affecting the efficiency of the

5

airline's operations, and the Milwaukee station limited light duty assignments thereafter. (*Id.* ¶ 49-50.)

AirTran maintained written employment policies in its Crew Member Handbook, which was updated periodically. (*See* Def.'s Ex. 1.) Specifically, it included written policies regarding equal employment opportunities and sexual harassment. For the most part, all new AirTran employees receive a copy of the then-current Handbook during their initial company training in Atlanta. This was true for Jensen, Dalton, Henneman and Cain. (SPFOF ¶ 26). Updated versions of the Handbook are mailed to each station and distributed to the employees. (DPFOF ¶ 17.) In addition, electronic versions of the Handbook are available online through the company's intranet service, and the company's anti-harassment policies were posted throughout the employee break areas and behind the ticket counter. (DPFOF ¶¶ 18-19.)

As noted, Jensen started work as a customer service agent at AirTran in July 2002. During initial training in Atlanta, Jensen, along with Dalton, Henneman, and Ott, took part in sexual harassment training. (SPFOF ¶¶ 28.) These included instructions on what constitutes harassment, and the means of reporting such harassment. (DPFOF ¶ 20.)

Jensen injured her knee while working at AirTran on April 18, 2003. That day she visited a physician, who directed that she could return to work with the restriction that she not lift in excess of twenty pounds for one week. (SPFOF ¶ 62-63.) Consequently, Jensen requested that she be permitted to work that week. However, AirTran denied the request given her restriction—Cross informed Jensen that "light duty" was not available. (DPFOF ¶ 101; Pl.'s Ex. 2 at 137-38.) Jensen was cleared to return to work without restriction on April 23, 2003. (DPFOF ¶ 64.)

6

On June 22, 2003, Jensen learned that she was pregnant. (PPFOF ¶ 450.) A few months later, on August 5, 2003, she injured her back while on duty at AirTran and visited a physician the following day. The physician directed that Jensen could return to work the next day (August 7, 2003) with restrictions on lifting, bending, pushing and pulling for one week. (SPFOF ¶¶ 65-66.) AirTran did not permit Jensen to work with those restrictions according to Sellers, because there was no "light duty" available. (DPFOF ¶ 102; Pl.'s Ex. 2 at 148.) But, Seller's informed Jensen that she wanted Jensen to return to work soon. (Pl.'s Ex. 2 at 147.) Jensen was cleared by her physician to work without restriction on August 15, 2003. (SPFOF ¶ 67.)

In late August 2003, medical issues arose regarding Jensen's pregnancy. She visited a physician on September 2, 2003, and was advised to perform sedentary work for the remainder of her pregnancy. Jensen relayed this information to Sellers on September 2, 2003, and Sellers replied that she could not permit Jensen to return to work with such restrictions. (SPFOF ¶¶ 71-72.) Jensen then asked her physician to revise her restrictions. The revised restrictions, obtained on September 9, 2003, provided that Jensen could return to work on September 15, 2003, provided she would not lift more than 20 pounds for the remainder of her pregnancy. Sellers responded by indicating to Jensen that AirTran could not allow her to work even with the revised medical restrictions. (SPFOF ¶ 75.)

Around that same time, the management of the Milwaukee station was informed that it needed to furlough several employees immediately to accommodate a reduced flight schedule. (Morris Decl. ¶ 31; DPFOF ¶ 61.) Agents at the Milwaukee station were advised by a memorandum dated September 17, 2003, that the number of

positions would be reduced through voluntary transfers or furloughs. (Def.'s Ex. 26; DPFOF ¶ 62.) Six customer service agents were to be laid off.

AirTran's policy provided that employees would be chosen for furlough on the basis of performance, attendance, ability to work, and, lastly, seniority. (Morris Decl. ¶ 31; Def.'s Ex. 26; DPFOF ¶ 64.) Effective October 6, 2003, Jensen, Customer Service Agents Carrie Jackson, Laurie Dalton, Duane Lettow, Michelle Roska, and Virnita Wilturner were selected for furlough and laid off. (Fox Decl. ¶ 46; DPFOF ¶¶ 65-66.)

Jensen filed an administrative charge with the Wisconsin Department of Workforce Development, Equal Rights Division (ERD), on November 3, 2003, and cross filed with the Equal Employment Opportunity Commission (EEOC). (SPFOF ¶ 42; PPFOF ¶ 473.) She gave birth on February 9, 2004. On March 2, 2004, Jensen was notified by AirTran that she was being recalled to work. (SPFOF ¶ 82.) Jensen responded on March 8, 2003 (through her attorney) requesting that she be placed on FMLA leave status for "several weeks" while she "continues to heal from the birth of her child and to provide care for her newborn." (SPFOF ¶ 83; Def.'s Ex. 30.) AirTran responded by letter that Jensen was not eligible for FMLA leave, but offered to place Jensen on unpaid leave pursuant to company policy through May 2, 2004. AirTran noted in the letter that Jensen must return to work on May 3, 2004, by reporting to AirTran's facilities in Atlanta for training. (Def.'s Ex. 31.) The letter further advised that failure to report on May 3, 2004, would be considered by AirTran as a voluntary resignation. (*Id.*) On April 27, 2003, Jensen requested that she be permitted an additional two months of personal leave beyond May 2, 2004. This request was denied by AirTran because its personnel needs at the Milwaukee station

8

dictated that it recall agents or hire new agents. (DPFOF ¶ 109.) Jensen did not report to work on May 3, 2004. (SPFOF ¶ 84-85.)

On March 10, 2006, Jensen was issued a Notice of Right to Sue on her charge of discrimination by the EEOC. (PPFOF ¶ 474.) This action followed.

DISCUSSION

I.  Unlawful Discrimination

Title VII forbids workplace discrimination against an employee "with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act (PDA) amended Title VII to define discrimination because of sex to include discrimination "'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *See Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 842 (7th Cir. 2007) (quoting 42 U.S.C. § 2000e(k)).

Jensen presents no direct evidence of discrimination, and instead relies on the indirect, burden shifting approach. Under this approach, Jensen must first present a prima facie case of discrimination by establishing that: (1) she was a member of a protected class; (2) she was performing her duties satisfactorily; (3) she suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. *See LaFary v. Rogers Group, Inc.*, No. 09-1139, 2010 WL 92485, *3 (7th Cir. Jan. 12, 2010); *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir.2001). "For pregnancy discrimination cases, the plaintiff also must establish that her employer knew she was pregnant." *LaFary*, 2010 WL 92485, *3 (citing *Griffin*, 489 F.3d at 844).

9

"If the plaintiff satisfies these elements, the employer must identify a nondiscriminatory reason for the action taken; if it does so, the plaintiff may avoid summary judgment only if she can produce evidence that the proffered reason is pretextual." *Id.* (citing *Clay*, 253 F.3d at 1005.)  In this case, there is no dispute that Jensen was a member of a protected class[4] and, for the most part, performed her duties satisfactorily (though AirTran notes that Jensen received several discipline reports).

## A. Denial of Light Duty

As an initial matter, Jensen asserts that AirTran discriminated against her by refusing to permit her to work "light duty" in April, August, and September 2003.  (Pl.'s Br. 33.)  She alleges that by not being permitted to work light duty, she suffered loss of wages. Further, she contends that "male and non-pregnant female employees were consistently allowed to work light duty, sometimes for weeks or months at a time."[5]  (Pl.'s Br. 34.)

The first date on which Jensen maintains that she was denied light duty was April 18, 2003.  However, at that time she was complaining of a knee injury and her physician imposed medical restrictions for one week.  Pregnancy was not an issue or subject of discussion.  In response to Jensen's request to work light duty that week, Cross informed her that light duty was not available.  Jensen's claim that this refusal to assign her to light duty was pregnancy discrimination fails on its face because the record indicates that she did not find out that she was pregnant *until June 2003.*

---

[4] In her response brief, Jensen refers to sex discrimination and pregnancy discrimination interchangeably.  (Pl.'s Br. in Opp. 33-36.)  When discussing her claim, she contrasts herself with "male and non-pregnant females."

[5] Here, Jensen's brief provides no discussion of facts or law to support such broad assertions.  (Pl.'s Br. 34.)  She simply cites to portions of her proposed findings of fact, contrary to Civil Local Rule 56.2(d) (noting that "All factual assertions made in any brief must be supported by . . . specific citations to evidentiary materials in the record").

Moving on, Jensen's other allegations of discrimination relate to her back injury of August 5, 2003, and medical issues concerning her pregnancy in September 2003. With regard to her back injury, Jensen was restricted to lifting no more than five pounds, bending no more than six times per day and no pushing or pulling with more than six pounds of force until August 13, 2003. Sellers denied Jensen's request to work light duty the week following this injury, stating that light duty was unavailable. Jensen returned to work without restriction on August 15, 2003.

With regard to Jensen's pregnancy issues in early September 2003, the record indicates that Seller's denied her light duty request due to the medical restrictions imposed by her doctor. The medical restrictions required sedentary work, including no standing or walking except to get out of a chair, and lifting small items only. (SPFOF ¶ 70). These restrictions were to last for the remainder of Jensen's pregnancy (until early February 2004). When Jensen had her restrictions revised so that she could return to work on September 15, 2003, but not lift more than 20 pounds for the remainder of her pregnancy, Sellers informed Jensen that AirTran could not accommodate the revised medical restrictions.

To support her claims that these denials of light duty qualify as discrimination, Jensen asserts that male and non-pregnant female employees were permitted to work light duty. She then points to several customer service agents who were permitted to work light duty for "weeks or months" at various points during 2002 and 2003.

11

Upon review of the record, the following assertions have evidentiary support[6]: Sheryl Blehovde may have worked one week on light duty in December 2002, (Pl.'s Ex. 6 (Blehovde Dep.) at 88.); Sidney Sharpe worked at the ticket counter in July 2002 and August 2002; Todd Zirzow worked light duty for approximately fifteen days in July 2002 following an injury (Fox. Decl. ¶ 33); Louann Kojis worked the ticket counter and gate area (but not the ramp) for a month or more following her shoulder surgery in the summer of 2003; Thomas O'Neill worked light duty in July and August 2002 for approximately five weeks following surgery (Fox Decl. ¶ 35; PPFOF ¶¶ 73-74.); and Susan Henneman worked the ticket counter for two weeks following a an elbow injury in early August 2003 (Pl.'s Ex. 3 at 246-47, 324-25). In addition, Jensen points to several work schedules that have certain customer service agents assigned for multiple weeks to one position—primarily the ramp. (*See* PPFOF ¶¶ 78-81; Pl.'s Ex. 20-22.)

In considering Jensen's claims, several concerns arise. Importantly, Jensen is unable to establish that she was treated less favorably than similarly situated employees who were not pregnant. As a general matter, a court must look at all relevant factors in determining whether two employees are similarly situated, and the number of factors depends on the context of the case. *See Radue v. Kimberly-Clark Corp.*, 219 F.3d 612,

---

[6] Jensen's brief states "male and non-pregnant female employees were consistently alleged to work light duty, sometimes for weeks or months at a time" and cites to her proposed findings of fact. (Pl.'s Br. 34.) In turn, her proposed facts often consist of similarly broad statements, several of which lack evidentiary support. For instance, Jensen asserts that Ruth Patrick "worked light duty in August and September 2003." (PPFOF ¶ 75.) However, the testimony she cites in support of this proposed fact reveals that (1) it was unknown if Patrick had any medical restrictions, and (2) it was unknown when she actually worked light duty. (*See* Pl.'s Ex. 2 at 221-23; Pl.'s Ex. 3 251-52.) The same goes for Jensen's assertion that Kathy Keckhaver "worked light duty in July, August and September 2003 after being injured in a car accident on July 21." (PPFOF ¶ 76.) While the record indicates that Keckhaver was in a car accident, (*see* Pl.'s Ex. 23 at 1712-13), Jensen's testimony on this point (relied on for this proposed finding of fact) reveals that she cannot remember the time period Keckhaver may have worked light duty or whether Keckhaver had any medical restrictions, (Pl.s' Ex. 2 at 221-23).

12

617-18 (7th Cir. 2000); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006) ("The inquiry is fact intensive, requiring consideration of the circumstances as a whole."). "[M]embers of the comparison group must be comparable to the plaintiff in all *material* respects." *Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006); *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997). This includes establishing that a similarly situated employee was treated more favorably at the time of the alleged discrimination. *See Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005).

While Jensen throws out the names of several customer service agents who may have been assigned light duty during 2002 and 2003, she does not establish that at that time any of those agents had medical restrictions sufficiently similar to those imposed by her physician. And, the PDA does not require employers to give pregnant women special treatment; it provides only that they must treat them the same as all other employees. *See Maldonado v. U.S. Bank*, 186 F.3d 759, 762-63 (7th Cir. 1999); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 738 (7th Cir. 1994) ("Employers can treat pregnant women as badly as they treat similarly affected but nonpregnant employees, even to the point of conditioning the availability of an employment benefit on an employee's decision to return to work after the end of the medical disability that pregnancy causes."). As "light duty" appears to be an amorphous concept that simply refers to assignments with reduced physical labor, the provision of light duty at any given time depends on the ability of the injured agent to function as a member of the work crew with respect to the needs and demands of the business. In other words, the medical condition of each comparator and the immediate personnel requirements of AirTran at the time of the alleged discrimination are material aspects of this inquiry.

13

Jensen's medical restrictions following her back injury in August 2003 severely limited her ability to lift, bend, push or pull. However, she puts forward no evidence that any of her alleged comparators suffered similarly severe restrictions while being permitted light duty—indeed, it is unclear that any employee with such significant restrictions of pushing, pulling, bending, and lifting could reasonably perform even light work.

The same goes for the denial of Jensen's light duty request in September 2003. While her post-September 15, 2003, medical restrictions were less limiting than those issued in August, Jensen does not establish that her medical restrictions were comparable to those of the agents she cites as having received favorable treatment. (*See* Pl.'s Br. 33-34; PPFOF ¶¶ 61-77.)[7] Simply asserting that certain male and nonpregnant female employees were allowed to work light duty at various points in time following unspecified injuries is insufficient. And, even assuming that the substance of Jensen's medical restrictions was sufficiently similar to one or more of her comparators, she can point to no comparator who requested and received a light duty assignment for nearly five months (the remainder of Jensen's pregnancy),[8] let alone one who requested such a

---

[7] Jensen is alleging that other agents with similar medical restrictions (e.g. lifting, pushing, bending) had their requests for light duty granted. That her medical restrictions are related to her pregnancy (as opposed to an on-the-job injury) is not an issue discussed by the parties.

[8] Only one of the alleged comparators, Louann Kojis, was permitted light duty for more than a few weeks. And, the record reflects that Kojis's prolonged assignment to the ticket counter during the summer of 2003 followed her successful bid on one of several part-time ticket-counter-only positions that opened in June 2003 and terminated in October 2003. (DPFOF ¶¶ 557-59.)

14

significant light duty assignment following the September 2003 directive that the Milwaukee station immediately furlough several employees.[9]

Furthermore, Jensen does not show how AirTran's explanation that light duty was not available to someone with her restrictions during the week of August 8, 2003, or from September 15, 2003, through early February 2003, was pretext. *See Clay*, 253 F.3d at 1005 (7th Cir. 2001) ("Pretext 'means a dishonest explanation, a lie rather than an oddity or an error.'" (quoting *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000)). As noted, the job description for a customer service agent includes the ability to bend, kneel, crawl, and lift items up to seventy pounds, as well as stand for an entire shift. While AirTran's policy was to work with agents who suffered on-the-job injuries and assess whether modified duty may be available, light duty was never guaranteed. Indeed, non-pregnant females, *including Jensen* (prior to June 2003), had light duty requests denied, thereby indicating that AirTran's actions were not motivated impermissibly by Jensen's pregnancy.[10]

B. Selection for Furlough

Next Jensen submits that she was discriminated against by being selected for furlough. As discussed earlier, on September 17, 2003, employees at the Milwaukee station were advised that furloughs were imminent. Jensen, Laurie Dalton, Carrie Jackson,

---

[9] Blehovde, Sharpe, Zirzow, and O'Neill allegedly preformed light duty in 2002, prior to the directive in early 2003 that the Milwaukee station limit light duty assignments, and well in advance of the directive that the Milwaukee station furlough several agents.

[10] Jensen also alleges that Cross and Fox made several negative and demeaning comments about her to others at AirTran (but not necessarily to Jensen herself). These include comments by Cross to Dalton that Jensen "slept around" and that her baby would be "trailer trash." (Pl.'s Br. 34.) While such comments, if true, are offensive, Jensen does not articulate how they relate to her pregnancy discrimination claim. If she is suggesting that this is evidence of pretext, it is insufficient inasmuch as she does not tie any of the comments to AirTran's decision to deny her light duty.

15

Duane Lettow, Michelle Roska, and Virnita Wilturner were selected for furlough effective October 6, 2003. According to Jensen, she had a better attendance record and more seniority than male and non-pregnant female employees who were not selected for furlough. On this point, she compares her situation with Customer Service Agents Lipsey, Davis, Adam Garringer, Nathan Rodriguez and Deanna Bublitz.

In addition, Jensen maintains that AirTran has provided shifting and inconsistent reasons for selecting her for furlough. On this point, she refers to an email from Sellers to Morris in November 2003 explaining certain aspects of the furlough decision:

> When making this decision [to furlough Dalton, Jensen, Jackson, Lettow, Roska, and Wilturner] I contacted Ann Giles concerning [Jensen and Dalton]. Since Laurie [Dalton] was on OJI [on the job injury] with no expected return, and Vicki [Jensen] was out with complications of her pregnancy, Ann said to go ahead with their lay-offs. The other four were on probation with tardiness problems, sicknesses, or mediocre performance.

(Pl.'s Br. 35; Pl.'s Ex. 38.) She then notes that Morris stated before the ERD that the decision to lay off Jensen was based on "attendance issues and her medical restriction, which prohibited her from performing the essential functions of her job." (Pl.'s Br. 35; PPFOF ¶ 470; Pl.'s Ex. 44.) Further, she notes that Sellers represented to the ERD that all of the women selected for furlough "had attendance problems, difficulty performing ramp duties and one, fair to poor performance at the job. Three of the women were on probationary status. The gentleman had medical problems that plagued him since he started and was on probationary status." (Pl.'s Br. 35-36, Pl.'s Ex. 35.)

16

However, Jensen has not established that similarly situated non-pregnant employees received favorable treatment. For instance, the evidence she puts forward in support of her claim that she had better attendance and performance records than her alleged comparators is her own conclusory testimony that she *believes* she had a better the better record. (*See* Pl.'s Br. 35; PPFOF ¶ 511; Pl.'s Ex. 2, 211-19.[11]) This is insufficient to create an issue of material fact. *See Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). Regardless, a review of the materials before the court indicates that Jensen's employment history for 2003 is not materially distinguishable from her alleged comparators. For instance, Jensen was issued Employee Discipline Reports (EDR) on the following dates: October 1, 2002 for tardiness; February 12, 2003 for insubordination and tardiness; May 4, 2003 for violating company rules; July 31, 2003 for absence; August 15, 2003 for violating company rules; August 27, 2003 for absence; August 28, 2003 for absence; and August 31, 2003 for absence. (SPFOF ¶¶ 50-56.) In comparison, according to Jensen's proposed findings of fact, Davis incurred seven EDRs prior to October 2003 (PPFOF ¶ 87); Garringer incurred eight EDRs prior to July 2003, only two of which occurred in 2003 (PPFOF ¶ 89); Rodriguez incurred four EDRs prior to October 2003 (PPFOF ¶ 93); Lipsey incurred seven EDRs prior to October 2003 (PPFOF ¶ 94); and Bublitz incurred thirteen EDRs prior to October 2003, seven of which were incurred in 2003. Moore was terminated in August 2003, and cannot be considered a comparator at the time of the furlough, (PPFOF ¶ 95). Further, Jensen does not articulate whether any of her alleged comparators had significant medical restrictions (in terms of

---

[11] In her brief, Jensen cites only to plaintiff's proposed finding of fact ¶ 511. Paragraph 511 in turn cites primarily to Jensen's testimony, and in part to the testimony of Latrina Cain. Jensen's testimony on this point is limited to her vague recollections of certain employees performance records.

17

duration and limitation) similar to those imposed by her doctor at the time that AirTran decided to furlough employees. Hence, Jensen falls far short of showing that the members of her comparison group are "comparable to the plaintiff in all *material* respects." *Crawford*, 461 F.3d at 846.

Even assuming Jensen were able to establish a prima facie case, she does not successfully rebut AirTran's position that she was selected for furlough based on her employment record and significant medical restrictions. Despite Jensen's assertion, it is not apparent that AirTran shifted its explanation regarding why she was furloughed. Indeed, it appears that AirTran's reasons have consistently followed its stated policy that employees would be chosen for furlough on the basis of performance, attendance, ability to work, and seniority. As discussed, it is undisputed Jensen was physically unable to perform the full range of duties of a customer service agent at the time she was selected for furlough, and she would not be able to perform such duties for an additional four months. The PDA does not protect a pregnant employee from being terminated based on an inability to perform her job even if her performance issues result from complications of pregnancy, unless the similar shortfalls of nonpregnant employees are overlooked. *See Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 583 (7th Cir. 2000). And as noted, Jensen has not shown that similarly situated non-pregnant coworkers avoided her fate.

## II. Unlawful Retaliation

"Title VII forbids an employer from discriminating against an employee who has 'opposed any practice' made unlawful by Title VII." *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 838 (7th Cir. 2009). "A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method." *Roby v. CWI, Inc.*, 579 F.3d 779, 786-87

18

(7th Cir. 2009) (citing *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662-63 (7th Cir. 2006).

"Under the direct method, a plaintiff must present evidence that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) a causal connection exists between them." *Scruggs*, 508 F.3d at 838. Alternatively, "a plaintiff proceeding under the indirect method establishes a prima facie case by establishing the first two elements, as well as: (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than a similarly situated employee who did not engage in statutorily protected activity. *Id.* (citing *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009) and *Kodl v. Bd. of Educ., Sch. Dist. 45, Villa Park,* 490 F.3d 558, 562 (7th Cir. 2007)).

"If the plaintiff succeeds in passing this initial hurdle, the burden shifts to the defendant to demonstrate a nondiscriminatory reason for its action. *Id*. (citing *Stephens*, 569 F.3d at 787). "If the defendant does so, the plaintiff must show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual to avoid the entry of summary judgment against [her]." *Id.* (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "'An employee's failure to cast doubt on an employer's nonretaliatory explanation' means a claim fails under either the direct or indirect method." *Id.* (quoting *Argyropoulos*, 539 F.3d at 736 n.6).

In the case at bar, Jensen alleges that she was sexually harassed by her coworkers, and that she complained of such harassment to her superiors. Subsequent to her complaints, Jensen alleges that AirTran took several adverse actions against her.

19

In response, AirTran asserts that this discussion can be limited because, regardless of which method of proof she chooses, Jensen cannot demonstrate that she engaged in a protected activity. "In order to demonstrate a case of [retaliation] a plaintiff must show that she opposed conduct prohibited by Title VII, or at a minimum that she had a 'reasonable belief' she was challenging such conduct." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997).

Jensen argument that she engaged in a protected activity follows an obscure path. Her first "complaint" was to Fox. Here, she asserts that she was pulled into a meeting sometime in 2002 or 2003 ("I believe it was either fall or spring, I just can't remember what year" (Pl.'s Ex. 2 at 253)), with Sellers, Fox, and Lipsey, where she was asked if any comments by Lipsey had made her uncomfortable. (Pl.'s Ex. 2 at 250-51.) She said no. After the meeting, she was outside smoking a cigarette with Fox and commented to Fox that some of Lipsey's comments *did* make her uncomfortable. (*Id.* at 251.) In this conversation, she mentioned that she was currently working nights with Moore and Lipsey, and she asked Fox if she could work a different shift because they made her uncomfortable. (*Id.*) Fox said no to this request. (*Id.* at 251, 257) Jensen did not tell Fox the specifics of why she was uncomfortable with Lipsey's comments, or provide any other details during this brief conversation. (*Id.* at 256-57.)

Jensen's second "complaint" was to Sellers. Here, she alleges that while working in the operations area in early spring 2003 she observed Moore and Lipsey with two female Transportation Security Administration (TSA) agents. (*Id.* at 273-75.) Moore and one of the agents went into Sellers' office, and Lipsey and the other agent went into the women's bathroom. While Jensen could not see what was happening, she heard

20

giggling and moaning. The next day she mentioned this to Sellers, who became upset. (*Id.* at 276.)

Notwithstanding the undeveloped allegations of sexual harassment, Jensen's comments to Fox and Sellers cannot reasonably be considered opposition to conduct prohibited by Title VII. As for Fox, she concedes that she never mentioned what comments made her uncomfortable or why they made her uncomfortable—she gave no indication that she believed that she (or anyone else) was being harassed or otherwise discriminated against. *See Gleason*, 118 F.3d at 1147; *see also Hamner v. St. Vincent Hosp. & Health Care Ctr.*, Inc., 224 F.3d 701, 707 (7th Cir. 2000) ("The plaintiff must not only have a subjective (sincere, good faith) belief that he opposed an unlawful practice; his belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII.") The same goes for her passing conversation with Sellers about the TSA agents. Jensen gave no indication that she believed she was opposing harassment, and she conceded in her deposition that she did not consider the incident with the TSA agents a form of sexual harassment. (Pl.'s Ex. 2 at 258.) Furthermore, Jensen points to no authority suggesting otherwise; and her references to *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848 (7th Cir. 2007) and *Benoit v. Technical Mfg. Corp.*, 331 F.3d 166, 175 (1st Cir. 2003) are unhelpful inasmuch as the plaintiffs in both cases complained explicitly about perceived unlawful discrimination. Without more, Jensen cannot succeed on her retaliation claim. *See Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720 (7th Cir. 2003) (concluding that retaliation claim was subject to summary judgment because the plaintiff's complaint to superiors that she felt "picked on" was insufficient to

21

invoke any action protected by Title VII); *Hamm v. Weyauwega Milk Prods.,* Inc., 332 F.3d 1058, 1066 (7th Cir. 2003).

### III.  Family and Medical Leave Act

Lastly, Jensen offers that AirTran "intentionally denied Plaintiff the ability to exercise her rights under the Family & Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq." (Compl. ¶ 48.)  In response, AirTran asserts, among other things, that this claim is untimely.

Pursuant to 29 U.S.C. § 2617(c)(1), an FMLA claim must be brought within two years of the last event constituting the alleged violation.  Here, Jensen concedes that her complaint in this action was filed more than two years after she was allegedly denied of FMLA leave in April, August, and September 2003.  However, she maintains that a three-year statute of limitations applies because AirTran's committed a "willful violation" of her rights under the FMLA.  29 U.S.C. § 2617(c)(2).  Courts have interpreted the standard for willfulness as either a knowing violation of the FMLA or actions taken with reckless disregard for the employee's rights under the FMLA.  *See Solorzano v. Railway & Indus. Servs*., Inc., No. 09-C-3733, 2010 WL 234972 (N.D. Ill. Jan. 15, 2010) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)); *Fialho v. Girl Scouts of Milwaukee Area, Inc.*, No. 06-C-1218, 2007 WL 1246433 (E.D. Wis. April 30, 2007); *Artis v. Palos Cmty. Hosp.*, Case No. 02-C-8855, 2004 WL 2125414 (N.D. Ill. Sept. 22, 2004).

To support her assertion that she is entitled to a three-year statute of limitations, Jensen simply states that she claimed an "intentional" violation in her complaint.

22

(Pl.'s Br. 40.[12])  This is not enough to survive summary judgment, and Jensen points to no authority supporting this assertion.  Jensen makes an additional argument that she relied on AirTran's "misrepresentations" regarding FMLA, but this does not speak to a knowing, willing, or reckless violation of Jensen's rights.[13]  Without more, her FMLA claim cannot go forward.  Therefore,

IT IS ORDERED that AirTran's Motion for Summary Judgment (Doc. # 19) is granted.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 10th day of March, 2010.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE

---

[12]  The entirety of Jensen's argument on this point is as follows: "Ms. Jensen's Complaint alleges that Defendant intentionally disregarded her FMLA rights, so she has adequately pleaded a willfully violation of the FMLA.  She also presented evidence that the Defendant was familiar with the FMLA.  This entitles her to the benefit of the 3-year limit for willful violations."  (Pl.'s Br. 40.)

[13]  Jensen's claim as to how Air Train interfered with her rights under the FMLA is a bit unclear.  According to Jensen, she requested FMLA leave after she was denied light duty in September 2003.  (Pl.'s Br. 41.)  Jensen then corresponded with AirTran's corporate offices, who sent her an application for leave.  The application arrived around September 19, 2003.  That day, Jensen was informed that she was selected for furlough.  With this foundation, she claims that she was "promised" FMLA leave and thus harmed by AirTran's "misrepresentations" when she was selected for furlough.  (Pl.'s Br. 42.)  In addition, it appears that AirTran had a policy consistent with the FMLA, but Jensen was not an eligible employee for the purposes of the FMLA inasmuch as AirTran never employed more than 49 people within 75 miles of the worksite.  *See* 29 U.S.C. § 2611(2)(B)(ii).

23